**FOR PUBLICATION**

<strong>UNITED STATES DISTRICT COURT<br>DISTRICT OF NEW JERSEY</strong>

| | | |
|---|---|---|
| : | | |
| MICHAEL STRATECHUK, individually and on behalf of his minor children, | : | |
| | : | |
| | : | **OPINION** |
| Plaintiff, | : | |
| | : | Civ. No. 04-6189 (WHW) |
| v. | : | |
| | : | |
| BOARD OF EDUCATION, SOUTH ORANGE-MAPLEWOOD SCHOOL DISTRICT; BRIAN F. O'LEARY, in his official capacity as Board President, Board of Education, South Orange-Maplewood School District; PETER P. HOROSCHAK, in his official capacity as Superintendent, South Orange-Maplewood School District, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**<u>Walls, Senior District Judge</u>**

Pursuant to Fed. R. Civ. P. 56, Plaintiff Michael Stratechuk moves for summary judgment on his first claim, alleging that "Defendants have conveyed the impermissible, government-sponsored message of disapproval of and hostility toward religion, including Christianity, in violation of the Establishment Clause." Defendants Board of Education, South Orange Maplewood School District (the "School Board"), Brian F. O'Leary, and Peter P. Horoschak ("Superintendent Horoschak") also move for summary judgment pursuant to Fed. R. Civ. P. 56, to dismiss Plaintiff's Amended Complaint in its entirety. The Court held oral argument on the motions for summary judgment on July 31, 2008. Defendants' motion for summary judgment is granted; Plaintiff's motion for summary judgment is denied.

**FOR PUBLICATION**

## FACTS AND PROCEDURAL BACKGROUND

Plaintiff Michael Stratechuk is the father and legal guardian of two minor children who live in the School District of South Orange and Maplewood, New Jersey (the "School District"). (Pl.'s Statement of Material Facts (No. 36-2) ("Pl.'s S.F.") ¶ 1.)  During the 2004-2005 school year – the relevant time period – one of Plaintiff's children attended Columbia High School and the other attended Maplewood Middle School.  (Id. ¶ 2.)

On April 2, 2001, the School Board adopted Policy 2270, Religion in the Schools. According to Policy 2270:

> It is the goal of the [School District] to foster mutual understanding and respect for the right of all individuals regarding their beliefs, values and customs.  In pursuing this goal, we recognize that we serve a diverse community with varying cultural, ethnic and religious orientation.
>
> We are cognizant of the role of culture, including religion, in the development of our society and believe that objectively teaching about religion and its role in the social and historical development of civilization does not violate the religious neutrality of the public schools.
>
> Music, art, literature, dance and drama along with religious customs and traditions, which have come to us from various elements of our national population, may be used to broaden our pupils' awareness of the many elements that comprise our diverse American culture.

(Cert. of Michael F. O'Neill ("O'Neill Cert."), Ex. A (No. 37-4) at SO0140.)  Given this goal the School Board adopted the following practices regarding the "Treatment of Religion in the Curriculum:"

> 1.      Permit the inclusion of religious literature, music, drama, dance and visual arts in the curriculum provided that it achieves specific goals of the written curriculum in the various fields of study; that it is presented objectively; and that it neither inhibits nor advances any religious point of view.

FOR PUBLICATION

2.  Accommodate student-initiated expression in response to questions or assignments which reflect their beliefs or non-beliefs about religious themes.

a.  Students are free to express religious belief or non-belief in compositions, works of art, music, speech and debate. Provisions should be made so that such expression is neither encouraged nor discouraged, but is handled in a courteous and respectful manner.

3.  Only permit religious symbols to teach about historical or cultural context, not to promote or celebrate religious concepts, events or holidays.

a.  Classroom use and/or display of religious symbols is permitted on a temporary basis as a teaching resource or aide only within the framework of the curriculum. The use and/or display of religious symbols should provide an environment whereby students of all faiths, beliefs or non-beliefs can participate without betraying their own faith or beliefs.

(Id., Ex. A at SO0140-41.)  Moreover, the School Board adopted the following practices

regarding the "Treatment of Religious Holidays in Classrooms, School Buildings, Programs or

Concerts:"

1.  Religious holidays are not to be celebrated in the schools, except in the form of the secular nature of that holiday. However, opportunities to learn about cultural and religious traditions should be provided within the framework of the curriculum. Information about religious and cultural holidays and traditions, focusing on how and when they are celebrated, their origins and histories may be part of this instruction.

2.  In planning school activities related to the teaching about religious holidays or themes, special effort must be made to ensure the activity is not devotional and that pupils of all faiths and beliefs can join without feeling they are betraying their own faith or beliefs.

3.  Decorations with religious significance are not permitted.

4.  Religious music, like any other music, can only be used if it achieves specific goals of the music curriculum.

FOR PUBLICATION

      a.     Music programs prepared or presented by student groups as an outcome of the curriculum shall not have a religious orientation or focus on religious holidays.

(Id., Ex. A at SO0141.)

Before the 2004-2005 school year, holiday music, including traditional Christmas carols and Hanukkah songs, was performed at the School District's December concerts.  (Pl.'s S.F. ¶¶ 3-4; Defs.' Br. in Support of Summ. J. (No. 37-2) ("Defs.' Supporting Br.") at 5.)  In the Fall of 2003, music teacher William Cook contacted Sharon Cohen, a parent of one of his students, "who objected to her daughter playing certain music that we were doing at a concert" and who stated that "she didn't want her daughter to play the music at the concert."  (Pl.'s Mot. for Summ. J., Ex. C (No. 36-6) at 35:19-36:10, 40:10-18.)  Ms. Cohen also told Mr. Cook that "Christianity was forced upon her in her youth."  (Id., Ex. C, Ex. 4.)  Mr. Cook advised the Director of Fine Arts, Nicholas Santoro ("Director of Fine Arts Santoro"), of his conversation with Ms. Cohen, and Director of Fine Arts Santoro recounted the situation to Assistant Superintendent James Memoli ("Assistant Superintendent Memoli").  (Id.)

On January 21, 2004, Ms. Cohen sent Superintendent Horoschak a letter, complaining that "the selection of music [at the South Orange Middle School 2003 December concert], both instrumental and vocal, had a clear religious orientation and focused on religious holidays. . . . in direct violation of the Board policy # 2270 4 (a)."[1]  (Decl. of Attorney Robert J. Muise (No. 38),

---

[1]  According to Superintendent Horoschak, he had a general recollection of parents' expressing similar concerns regarding the subject matter of the December concerts during the time period between 1998 and 2003, although he could not remember any specific instance other than one where a Muslim parent raised concerns that his/her faith was not represented during the concert.  (O'Neill Cert., Ex. B (No. 37-5) at 53:13-57:1.)  Additionally, Assistant Superintendent

FOR PUBLICATION

Ex. P-5 at SO0212-13.)  On March 1, 2004, Superintendent Horoschak responded to Ms. Cohen's

letter, noting that with respect to the 2003 December concert, "[i]t was our judgment that because

of the variety of both secular and 'holiday' (i.e., Hanukkah and Christmas) selections . . . there

was not one particular focus on a particular religion or religious group, and, as such, there was no

attempt to advance any religious point of view."  (Pl.'s Mot. for Summ. J., Ex. F (No. 36-10), Ex.

P-6 at SO0375.)  Superintendent Horoschak continued, however, that although "[w]e are

cognizant of the policy, and are careful to follow it. . . . concerns raised by parents regarding the

holiday concert at South Orange Middle School suggest that the policy needs further

clarification."  (Id.)  Further, he stated that "Assistant Superintendent Jim Memoli and Director of

Fine Arts Nicholas Santoro are engaged in on-going discussions about such musical programs,

and they will recommend to me suggested language for regulations which should clarify what

types of programs and activities are permissible and not permissible under this policy."  (Id.)

On or about March 24, 2004, Superintendent Horoschak had his annual performance

review with the School Board.[2]  (Defs.' Supporting Br. at 5.)  At this review, the issue of the

---

Memoli stated that he "know[s] there have been other complaints over the years," but he "can't
name the individuals."  (Id., Ex. E (No. 37-8) at 23:24-25:3.)

[2]  At least one of the School Board members who was at the performance review was
Shelly Slafkes.  (Pl.'s S.F. ¶ 9.)  She is a "good acquaintance" of Ms. Cohen.  (Id. at n.6.)
During the November 22, 2004 meeting of the School Board, she stated that "[i]t is my strongly
held belief that school assemblies and other school activities should not contain religious content
in our music."  (Pl.'s Mot. for Summ. J., Ex. H (No. 36-13) at 28:8-10.)  Ms. Slafkes suggested
that "[w]hen religious content is included, many children – and I can speak for how I felt as a
youngster – feel both uncomfortable and forced to choose between the chorus or band and their
religious beliefs," and expressed her opinion that "the only way that the school district can
respect the differences and beliefs of each person in our diverse communities is by eliminating
religious celebration in our public schools."  (Id., Ex. H at 28:10-18.)  Ms. Slafkes noted,
however, that "I do believe strongly that as part of the social studies, language arts, and other

FOR PUBLICATION

implementation of Policy 2270 with respect to the December concerts was raised.  (O'Neill Cert.,

Ex. B (No. 37-5) at 111:9-113:13.)  According to Superintendent Horoschak, "board members

had heard from some community members about instrumental music that they felt, people felt

represented a celebration of Christmas holidays and also there ha[d] been discussion about the

fact that you really can't balance all religious groups in these representations in these types of

performances."  (Id., Ex. B at 113:2-11.)  Ultimately, the School Board indicated that the outcome

that it desired was "that [Policy 2270] would be consistently implemented, that it be supervised,

that there wouldn't be so much discretion at every – by every faculty member," (id., Ex. B at

114:2-10), and discussed with him drafting regulations regarding Policy 2270, (Defs.' Resp. to

Pl.'s Statement of Material Facts (No. 43-2) ¶ 8; see Pl.'s S.F. ¶ 8.)

        In September 2004, Director of Fine Arts Santoro held a department meeting, wherein he

"discussed [with the School District music staff] how I would be approving their programs and

that we could do religious music," but they should "try to avoid the holiday music."  (O'Neill

Cert., Ex. H (No. 37-11) at 57:13-24.)  At that time, Director of Fine Arts Santoro had not yet told

the School District music staff that "Christmas Carols [were] out".  (Id., Ex. H at 58:3-5.)  On

October 14, 2004, Superintendent Horoschak met with Director of Fine Arts Santoro, Assistant

Superintendent Memoli, and the School District's attorney, Ellen Bass (the "October 14, 2004

meeting"), "to review the requirements of Policy 2270 . . . and to resolve various parent concerns

regarding the implementation of the policy."  (Id., Ex. I (No. 37-12) at SO0142; see Pl.'s S.F. ¶¶

_____

curriculum areas, we should and for the most part do teach our children about each religion and
culture, their beliefs and holidays."  (Id., Ex. H at 30:9-13.)

FOR PUBLICATION

13-14.)  According to Assistant Superintendent Memoli, the discussion at that meeting involved "what we do for the students in this district, what is best for them so that we feel that we're treating everyone on an equal basis, what was educationally sound," (Defs.' Reply Br. in Support of Mot. for Summ. J. ("Defs.' Reply Br."), Ex. B (No. 45-4) at 53:5-15), and making sure that "no child feels uncomfortable in celebrating a holiday that wasn't their own," (id., Ex. B at 59:23-25). Assistant Superintendent Memoli stated that he "want[s] the students to feel comfortable when they're in this school system building and in their classroom; and, anything that makes them uncomfortable effects [sic] their ability to learn."  (Id., Ex. B at 57:6-12.)

Director of Fine Arts Santoro drafted a memorandum to the School District music staff on October 29, 2004 (the "October 29, 2004 memorandum"), forwarding the decisions made at the October 14, 2004 meeting.  (O'Neill Cert., Ex. I (No. 37-12) at SO0143; Pl.'s S.F. ¶ 19.)  Director of Fine Arts Santoro wrote that "in my three-plus years in the district, I have been reviewing your programs to insure [sic] that we are in compliance with [Policy 2270],"[3] and that following the meeting, " I now have a clearer picture of the expectations of [Policy 2270]." (O'Neill Cert., Ex. I (No. 37-12) at SO0143; see Pl.'s S.F. ¶¶ 15-16.)  Director of Fine Arts Santoro continued that "[i]n short, we will continue to use common sense when selecting music for the Holiday concerts," but also presented six specific bullet points:

> • All programs will be reviewed and approved by me.  To save time and effort, I will come to you to look at your repertoire.  Please let me know when I can do this.

---

[3] Before 2004, Santoro did not object to any music on the basis of its content, including that performed during the December concerts.  (Pl.'s S.F. ¶¶ 17-18.)

FOR PUBLICATION

- We will avoid any selection which is considered to represent any religious holiday, be it Christmas, Hanukkah, etc.  This holds true for any vocal or instrumental setting.

- I would strongly suggest you gear towards the seasonal selections – Winter Wonderland, Frosty The Snowman, etc.  Music centered on Peace is also a nice touch.

- For the High School, the Brass Ensemble repertoire must also adhere to this policy, so the traditional carols must be eliminated from the repertoire.

- The MKL [sic] Gospel Choir cannot perform at the CHS Holiday Assembly for the student body.

- Your printed programs for any Holiday concert must avoid graphics which refer to the holidays, such as Christmas Trees and dreidels.

(O'Neill Cert., Ex. I (No. 37-12) at SO0143; Pl.'s S.F. ¶¶ 20-22, 24-25.)

Following the issuance of the October 29, 2004 memorandum, Director of Fine Arts Santoro explained its contents in greater detail "when responding to direct inquiries from the faculty."  (Defs.' Supporting Br. at 7.)  As example, in response to an e-mail from music teacher Barbara Eames, Director of Fine Arts Santoro clarified that "according to the policy, you can teach about the different holidays in your music classes" as "[c]lassroom work is not a 'program'" within the meaning of Policy 2270.  (O'Neill Cert., Ex. J (No. 37-13).)  In response to another e-mail from Ms. Eames, Director of Fine Arts Santoro indicated that Vivaldi Gloria (Cum Sancto Spiritu) could be performed under Policy 2270 because "[t]he program does not have a religious orientation and it does not refer to a holiday."  (Id., Ex. K (No. 37-14).)  Further, Director of Fine Arts Santoro noted that Ms. Eames "CAN teach about the holidays in class as it is presented in [Policy 2270]."  (Id.)

-8-

**FOR PUBLICATION**

In addition, Director of Fine Arts Santoro began to receive programs from the School

District music staff in order to determine whether they were in accord with Policy 2270. As

example, on November 16, 2004, Mr. Cook sent Director of Fine Arts Santoro a letter with the

following message:

> Nick:
>
> For the Holi...uh, Ram...uh, Hanuk...uh, Chri...uh, December concert the 7th
> & 8th grade Orchestras at SOMS and MMS will be performing the following:
>
> The Star Spangled Banner by Key
> The Great Gate of Kiev by Mussorgsky
> Hava Nagila - traditional
> Concerto in D by JS Bach
> Winter Wonderland (maybe) by Smith and Bernard
>
> I will try to keep all references to the birth of You Know Who, the 8 days of
> You Know What and the R Month to a minimum.
>
> Thank you for your consideration.

(Pl.'s Mot. for Summ. J., Ex. C (No. 36-6), Ex. 8.) On November 17, 2004, John DeVita, faculty

advisor for the MLK Gospel Choir, sent a memorandum to Director of Fine Arts Santoro

proposing "to sing the first verse of 'Lift Every Voice and Sing' in honor of Quanza (a non

religious holiday)" and including the lyrics. (Id., Ex. M (No. 36-19) at SO0479.)

During November and December 2004, the School District received a number of

complaints from members of the South Orange and Maplewood, New Jersey community, (id.,

Exs. F (Nos. 36-10 & 36-11), Exs. P-11 - P-12, P-57, P-62 - P-65, P-67 & K (No. 36-17)),

FOR PUBLICATION

including from the South Orange Village President, (id., Ex. F (No. 36-10), Ex. P-13).[4]  In

addition, members of the community lodged complaints during meetings of the School Board on

November 15 and 22, 2004.  (Id., Exs. H (No. 36-13) & J (No. 36-16).)  Seventeen members of

the Maplewood, New Jersey community signed a "Petition Asking the Board of Education to

Honor Religious Tolerance."  (Id., Ex. F (No. 36-11), P-78.)  On November 22, 2004, the co-

Presidents of the Columbia High School Music Parents' Association sent a letter to

Superintendent Horoschak and the School Board "formally request[ing] a review and

reinterpretation" of Policy 2270.  (Id., Ex. F, Ex. P-68.)  "The district's music teachers" addressed

a letter to Superintendent Horoschak and the School Board on November 23, 2004, "to express

their extreme concern and their intense opposition to the change in the interpretation of the

district's holiday music policy."  (Id., Ex. F, Ex. P-66.)  A "posting" by an individual identified as

"Albatross" and "a graduate of Columbia[] [High School's] music program," indicated that the

Columbia High School Brass Ensemble's "repertoire is maybe 90% works attached to either

Christmas or Channukah," and as a result, "**[t]he remaining repertoire is not sufficient to**

**satisfy the performance requirements of a holiday brass group,**" (id., Ex. E (No. 36-8), Ex. P-

6), a contention with which Director of Fine Arts Santoro agreed, (id., Ex. E at 56:18-57:4).  And,

"[t]he members and advisors of the Martin Luther King Jr. Association Gospel Choir," which was

now restricted from performing at the Columbia High School December concert, despite having

done so in the past, noted its objection in a December 1, 2004 letter.  (Id., Ex. F (No. 36-10), Ex.

---

    [4]  Additionally, the School District received letters and e-mails from around the country,
mostly during the period between November and December 2004.  (Pl.'s Mot. for Summ. J., Ex.
F (Nos. 36-10 & 36-11), Exs. P-15 - P-20, P-22 - P-52, P-71.)

**FOR PUBLICATION**

P-14.)  Steve Lonegan, the mayor of Bogota, New Jersey, contacted Superintendent Horoschak on December 16, 2004, to request "permission to assemble people on the street outside of Columbia High School on December 21, 2004 at 5:00 PM for a festive presentation of traditional Christmas Carols and Hanukkah Hymns."  (Id., Ex. F (No. 36-11), Ex. P-53; see id., Ex. F, Exs. P-55 - P-56.)  Superintendent Horoschak denied Mr. Lonegan his permission.  (Id., Ex. F, Ex. P-55.)

According to the programs of concerts during and after 2004, songs with religious content that have been performed in the School District include – (1) Concerto VIII Fatto per la notte de natale; (2) Wade in the Water; (3) Waters of Babylon; (4) Agnus Dei/Cum Sanctis; (5) Laudamus Te; (6) Jubilate; (7) Ich will dem Hern; and (8) Cum Sancto Spiritu.  (Defs.' Supporting Br. at 9; see O'Neill Cert., Exs. M (37-16) & N (37-17).)  According to Mr. Cook, Policy 2270 "didn't prohibit all religious music," but only "prohibited music based on – or themes familiar – or themes consistent with pieces commonly associated with the holiday at the time of the holiday."[5] (Pl.'s Mot. for Summ. J., Ex. C (No. 36-6) at 77:6-12; see id., Ex. C at 73:6-12.)  Music teachers have continued to teach holiday songs that used to be performed in the December concerts in their classrooms, as well as other holiday music such as the "Nutcracker."  (Id., Ex. I (36-14) at 43:5-18; O'Neill Cert., Ex. L (No. 37-15) at 43:5-44:7.)  Director of Fine Arts Santoro confirmed that "[i]n performance concerts [certain] selections would not be allowed," but "[i]n the curriculum they would be allowed to be taught."  (O'Neill Cert., Ex. H (No. 37-11) at 32:8-13.)

---

[5]  Director of Fine Arts Santoro also stated that songs celebrating "a non-religious holiday," such as Kwanza purportedly is, can be performed during the December concerts.  (Pl.'s Mot. for Summ. J., Ex. E (No. 36-8) at 35:19-36:2.)

FOR PUBLICATION

Director of Fine Arts Santoro continues to review programs for the December concerts.

As example, on November 29, 2005, he received the following e-mail from music teacher Vern

Miller:

> Hi Nick,
>
> Both Middle School Bands and Orchestras will be joyantly performing the following pieces:
> 1.   Oh, Holy Night
> 2.   Angels We Have Heard On High
> 3.   We Three Kings
>
> We will be joined by the school choruses singing these selections while we play.
>
> Additionally, all performances will begin with a prayer and reading from the Holy scriptures.
>
> THOUGHT YOU MIGHT APPRECIATE OUR EFFORTS TO COMPLY WITH THE BOARD'S HOLIDAY MUSIC POLICY! ! !
>
> In truth,
>
> MMS Concert:      Monday, Dec 12th, 9:30 a.m.
>          Winter Wonderland
>          Dorian Rhapsody
>          Sing, Sing, Sing
>
> SOMS Concert:      Tuesday, Dec 13th, 9:30 a.m.
>          Winter Wonderland
>          Dorian Rhapsody

(Pl.'s Mot. for Summ. J., Ex. C (No. 36-6), Ex. 9.)

On October 10, 2005, the School Board adopted a new Policy 2270, Religion in the

Schools, which is identical to the old Policy 2270, aside from its exclusion of this language –

"Music programs prepared or presented by student groups as an outcome of the curriculum shall

not have a religious orientation or focus on religious holidays."  (See O'Neill Cert., Ex. O (No.

-12-

FOR PUBLICATION

37-18) at SO0148.)  In addition, on that same date, the School District's administration adopted

Regulation 2270, Religion in the Schools, to implement the new Policy 2270.  Regulation 2270

includes headings such as "Teaching of Religion as Part of the Curriculum," "Religion as part of

the Music and Art Curricula," and "Celebration of Religious Holidays Prohibited."  (Id., Ex. P

(No. 37-19).)

     Plaintiff filed his Complaint in this action on December 14, 2004, and his Amended

Complaint on March 22, 2005.  Plaintiff alleges a civil rights violation under the First and

Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, asserting that

"Defendants have conveyed the impermissible, government-sponsored message of disapproval of

and hostility toward religion, including Christianity, in violation of the Establishment Clause,"

(the "Establishment Clause claim"), (Am. Compl. (No. 5) ¶ 21), and that "Defendants have

unconstitutionally deprived Plaintiff and his minor children of their right to receive information

and ideas, their right to learn, and their right to academic freedom, which are guaranteed under

the First Amendment" (the "First Amendment claim"),[6] (id. ¶ 24).

     On May 16, 2005, Defendants filed a motion to dismiss, which the Court granted on

September 29, 2005.  Upon consideration, over Plaintiff's objection, of Policy 2270, the Court

concluded that "Plaintiff[] ha[s] not alleged any facts that if established would entitle [him] to any

relief under the Establishment Clause" and that Plaintiff's claim under the First Amendment as to

---

     [6]  The Court recognizes that the Establishment Clause is as much a part of the First
Amendment as the "right to receive information and ideas, the[] right to learn, and the[] right to
academic freedom."  For ease, however, the Court will refer to Plaintiff's non-Establishment
Clause claim as the "First Amendment claim."

-13-

FOR PUBLICATION

his children's right to receive information and ideas should be dismissed. (Op. (No. 13) at 16, 17.)

On October 5, 2006, the Third Circuit vacated the Court's September 29, 2005 Order and

remanded the case for further proceedings.  The Third Circuit objected to the Court's

consideration of Policy 2270, noting that "the policy Stratechuk describes is more restrictive than

the one set forth in the publicly available materials" meaning that "the official policy was not

'integral to or explicitly relied upon in the complaint.'"  Stratechuk v. Bd. of Educ., 200 Fed.

Appx. 91, 94 (3d Cir. 2006).  The Third Circuit held that "a categorical ban on exclusively

religious music, enacted with the express purpose of sending a message of disapproval of religion,

appears to state a claim under the First Amendment."  Id.

Plaintiff filed his motion for summary judgment on January 10, 2008, followed by

Defendants' motion for summary judgment on January 11, 2008, and the Court held oral

argument on the two motions on July 31, 2008.

## LEGAL STANDARD

Summary judgment is appropriate where the moving party establishes that "there is no

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary

judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247-48, 106 S. Ct. 2505, 2510 (1986).  A factual dispute is genuine if a reasonable jury could

return a verdict for the non-moving party, and it is material if, under the substantive law, it would

affect the outcome of the suit.  Id. at 248.  The moving party "always bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those

FOR PUBLICATION

portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). To survive a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence in his favor. Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324. "Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment." Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. Id. at 255; Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

FOR PUBLICATION

## DISCUSSION

There is no genuine issue of material fact(s) between the parties.[7]  There are intense

clashes between them as to the legal import and significance of the undisputed facts.

The Supreme Court "has long recognized that local school boards have broad discretion in

the management of school affairs."  Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v.

Pico, 457 U.S. 853, 863, 102 S. Ct. 2799, 2806 (1982).  As a result, "[c]ourts do not and cannot

intervene in the resolution of conflicts which arise in the daily operation of school systems and

which do not directly and sharply implicate basic constitutional values."  Epperson v. Arkansas,

---

[7]  There is a dispute between Plaintiff Michael Stratechuk and Defendants as to the source of the policy restricting the performance of holiday music during the December concerts. Plaintiff asserts that he has no issue with Policy 2270, and instead, his issue is with the October 29, 2004 memorandum, which he claims created an entirely new policy with respect to the performance of holiday music during the December concerts.  Defendants, however, argue that the October 29, 2004 memorandum simply presented an interpretation of certain language that was already a part of Policy 2270 – i.e., "[m]usic programs prepared or presented by student groups as an outcome of the curriculum shall not have a religious orientation or focus on religious holidays."

The Court finds that the source of the policy restricting the performance of holiday music during the December concerts is Policy 2270, viewed through the interpretive lens of the October 29, 2004 memorandum.  The October 29, 2004 memorandum was an outgrowth of the October 14, 2004 meeting.  The purpose of that meeting was "to review the requirements of Policy 2270 . . . and to resolve various parent concerns regarding the implementation of the policy."  (O'Neill Cert., Ex. I (No. 37-12) at SO0142.)  Although the meaning of the terms "focus on religious holidays" changed after the October 14, 2004 meeting and the issuance of the October 29, 2004 memorandum, Policy 2270 still remained the source of the School District's policy regarding the performance of holiday music during the December concerts.  The October 29, 2004 memorandum simply presented the reinterpretation of Policy 2270, as agreed to during the October 14, 2004 meeting.

Hereinafter, the Court will refer to the policy restricting the performance of holiday music during the December concerts as the "reinterpretation of Policy 2270."

-16-

FOR PUBLICATION

393 U.S. 97, 104, 89 S. Ct. 266, 270 (1968).  Courts, however, must not ignore that "'[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" Id. (quoting Shelton v. Tucker, 364 U.S. 479, 487, 81 S. Ct. 247, 251 (1960)).

Plaintiff Michael Stratechuk asserts that the interpretation of Policy 2270 violates his children's rights under the Establishment Clause and "their right to receive information and ideas, their right to learn, and their right to academic freedom" in violation of the First Amendment, necessitating this Court to overcome the deference that it would traditionally give to decisions of a local school board.  The Court concludes, however, that the interpretation of Policy 2270 does not violate the Establishment Clause or Plaintiff's children's other First Amendment rights.

      1.      **The Establishment Clause Claim**

Plaintiff's first claim is that the interpretation of Policy 2270 violates the Establishment Clause because it "convey[s] the impermissible, government-sponsored message of disapproval of and hostility toward religion."  According to the Establishment Clause, "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  Contained within this Clause is "the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general," Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532, 113 S. Ct. 2217, 2226 (1993), as "[t]he First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."  Epperson, 393 U.S. at 104.

FOR PUBLICATION

To analyze a claim under the Establishment Clause, courts have traditionally utilized the

three-pronged test first articulated by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 91

S. Ct. 2105 (1971).[8]  Under the Lemon test, a state action violates the Establishment Clause if any

of the following are true – (1) it lacks a secular purpose; (2) its principal or primary effect

---

[8]  Although the Lemon test has been repeatedly criticized, see, e.g., Lamb's Chapel v.
Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 398-99, 113 S. Ct. 2141, 2150-51 (1993)
(Scalia, J., concurring) (likening Lemon to "some ghoul in a late-night horror movie that
repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried"), it
still remains a viable test for determining whether a governmental action violates the
Establishment Clause, see McCreary County, Ky. v. Am. Civil Liberties Union of Ky., 545 U.S.
844, 859-67, 125 S. Ct. 2722, 2732-37 (2005) (referencing Lemon's purpose prong); Borden v.
Sch. Dist. of the Twp. of E. Brunswick, 523 F.3d 153, 175 (3d Cir. 2008) (listing the Lemon test
as one of three tests for determining whether governmental action violates the Establishment
Clause).  Additionally, courts have utilized two other tests – the coercion test and the
endorsement test – to analyze Establishment Clause claims.  Despite the existence of these other
tests, however, the Court concludes that the Lemon test is the most appropriate for determining
whether the interpretation of Policy 2270 violates the Establishment Clause.

"The coercion test looks at whether the government is 'coerc[ing] anyone to support or
participate in religion or its exercise.'" Borden, 523 F.3d at 175 n.18 (quoting Lee v. Weisman,
505 U.S. 577, 587, 112 S. Ct. 2649, 2655 (1992)).  Although the coercion test "focuses primarily
on government action in public education," Modrovich v. Allegheny County, Pa., 385 F.3d 397,
400-01 (3d Cir. 2004), it is inapplicable to this matter because Plaintiff does not allege that the
interpretation of Policy 2270 has had a coercive effect on his children.

"The endorsement test . . . asks whether a reasonable observer familiar with the history
and context of [a] display would perceive [a] display as a government endorsement of religion."
Id. at 401.  Despite an earlier Third Circuit opinion limiting the endorsement test to "cases
involving religious displays on government property," id., 385 F.3d at 401; see Freethought
Soc'y of Greater Phila. v. Chester County, 334 F.3d 247, 250, 257, 258 (3d Cir. 2003); Tenafly
Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 174 (3d Cir. 2002), the Third Circuit later
stated generally that "[t]he endorsement test applies '[i]n cases involving state participation in a
religious activity,'" Borden, 523 F.3d at 175 (quoting Santa Fe Indep. Sch. Dist. v. Doe, 530
U.S. 290, 308, 120 S. Ct. 2266, 2278 (2000)).  Regardless of the expansiveness of the
applicability of the endorsement test, however, the Court concludes that this matter does not
involve a religious display on government property or state participation in a religious activity.

-18-

FOR PUBLICATION

advances or inhibits religion; or (3) it fosters an excessive entanglement with religion.  403 U.S. at 612-13.

### A.   "Purpose" Prong

"In applying the purpose [prong], it is appropriate to ask 'whether government's actual purpose is to endorse or disapprove of religion.'" Wallace v. Jaffree, 472 U.S. 38, 56, 105 S. Ct. 2479, 2489 (1985).  "[T]he purpose prong of Lemon only requires some secular purpose, and not 'that the purposes . . . are 'exclusively secular.''" Freethought Soc'y of Greater Phila. v. Chester County, 334 F.3d 247, 262 (3d Cir. 2003) (quoting Lynch v. Donnelly, 465 U.S. 668, 681 n.6, 104 S. Ct. 1355, 1363 n.6 (1984)).  Accordingly, the Supreme Court "has invalidated legislation or governmental action on the ground that a secular purpose was lacking . . . only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations."  Lynch, 465 U.S. at 680.

But, "[w]hile the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham," Edwards v. Aguillard, 482 U.S. 578, 586-87, 107 S. Ct. 2573, 2579 (1987), because the purpose prong is not "a pushover for any secular claim," McCreary County, Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 864, 125 S. Ct. 2722, 2736 (2005). "The eyes that look to purpose belong to an ''objective observer,'' one who takes account of the traditional external signs that show up in the ''text, legislative history, and implementation of the statute,'' or comparable official act." Id. at 862.  Overall, however, the Third Circuit has stated that the purpose prong is "a 'low threshold,' and courts are generally deferential to the government's proffered secular purpose as long as it is

**FOR PUBLICATION**

legitimate."  Modrovich v. Allegheny County, Pa., 385 F.3d 397, 411 (3d Cir. 2004) (quoting

Freethought, 334 F.3d at 267).

Defendants assert that "[t]he performing of celebratory religious music at school-

sponsored events is prohibited because such performances are not necessary to achieve the

specific goals of the music curriculum and could be perceived as an overt endorsement of religion

or an improper focus on religious holidays."  (Defs.' Br. in Opp. to Pl.'s Mot. for Summ. J. (No.

43) ("Defs.' Opp. Br.") at 5-6, 8, 12-13.)  In other words, Defendants contend that "[t]he Policy,

as written and currently interpreted, is clearly designed with the goal of avoiding potential

Establishment Clause violations."  (Defs.' Supporting Br. at 18.)

Plaintiff responds, however, that "there is no requirement under the Establishment Clause

that the School District ban such music, including Christmas music during the Christmas holiday,

from its curricular, co-curricular, or extracurricular activities and events," which "evidence[s] . . .

the School District's illicit purpose."  (Pl.'s Br. in Support of Mot. for Summ. J. (No. 36-3) ("Pl.'s

Supporting Br.") at 34; Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. (No. 39) ("Pl.'s Opp. Br.") at

32-33; see id. at 14 ("[T]he School District's claimed purpose of 'avoiding potential

Establishment Clause violations' in light of the evidence and the well-established case law

regarding religious music is plainly a 'sham.'").)  Plaintiff concludes that "the School District's

policy targets certain music for disfavored treatment ***because it is*** ***religious*** ***or because it is***

***associated with a*** ***religious*** ***holiday***."  (Pl.'s Supporting Br. at 17, 30; Pl.'s Opp. Br. at 16; Pl.'s

Reply Br. in Support of Mot. for Summ. J. (No. 44) ("Pl.'s Reply Br.") at 10.)

FOR PUBLICATION

As an initial matter, the Court does not dispute Plaintiff's contention that the interpretation of Policy 2270 targets certain music "***because it is associated with a <u>religious</u> holiday***."[9]  That fact, however, is not incompatible with Defendants' stated purpose, nor does it presuppose the conclusion that Defendants' actual purpose is simply to show disapproval of religion.  And, Plaintiff has not provided any evidentiary support for his naked assertion that the purpose underlying Defendants' actions was to show disapproval of religion.

Actions taken to avoid potential Establishment Clause violations have a valid secular purpose under the purpose prong of the <u>Lemon</u> test.  <u>See, e.g.</u>, <u>Vasquez v. Los Angeles ("LA") County</u>, 487 F.3d 1246, 1255 (9th Cir. 2007); <u>Bishop v. Aronov</u>, 926 F.2d 1066, 1077 (11th Cir. 1991); <u>Roberts v. Madigan</u>, 921 F.2d 1047, 1054 (10th Cir. 1990); <u>cf.</u> <u>Borden v. Sch. Dist. of the Twp. of E. Brunswick</u>, 523 F.3d 153, 174 (3d Cir. 2008) ("The Supreme Court has stated that 'compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech.'").  Plaintiff, however, argues that Establishment Clause

---

[9]  The Court, however, does question Plaintiff's contention that the interpretation of Policy 2270 targets certain music simply "***because it is <u>religious</u>***."  Such a statement does not accord with the text of Policy 2270, which "[p]ermits the inclusion of religious literature, music, drama, dance and visual arts in the curriculum" and which stipulates that "[r]eligious music, like any other music, can only be used if it achieves specific goals of the music curriculum." (O'Neill Cert., Ex. A (No. 37-4) at SO0140-41.)  Furthermore, it ignores that performances of religious songs such as Concerto VIII Fatto per la notte di natale, Wade in the Water, Waters of Babylon, Agnus Dei/Cum Sanctis, Laudamus Te, Jubilate, Ich will dem Hern, and Cum Sancto Spiritu have continued, (Defs.' Supporting Br. at 9; <u>see</u> O'Neill Cert., Exs. M (37-16) & N (37-17)), in accordance with Policy 2270, (<u>see</u> Pl.'s Mot. for Summ. J., Ex. C (No. 36-6) at 77:6-12), and that music teachers have continued teaching holiday songs that used to be performed in the December concerts in their classrooms, (<u>id.</u>, Ex. I (36-14) at 43:5-10; O'Neill Cert., Ex. L (No. 37-15) at 43:5-10), in accordance with Policy 2270, (<u>see</u> O'Neill Cert., Ex. H (No. 37-11) at 32:8-13).

**FOR PUBLICATION**

caselaw definitively holds that Defendants need not have placed restrictions on the performance

of holiday music at the December concerts, undermining Defendants' stated purpose and thereby

rendering that purpose a sham.  Establishment Clause jurisprudence, however, defies such a

categorical claim.  "The Establishment Clause . . . is not a precise, detailed provision in a legal

code capable of ready application."  <u>Lynch</u>, 465 U.S. at 678.  Instead, it "is a blurred, indistinct,

and variable barrier depending on all the circumstances of a particular relationship," <u>Lemon</u>, 403

U.S. at 614, meaning that "each case . . . calls for line drawing" and that "no fixed, <u>per se</u> rule can

be framed," <u>Lynch</u>, 465 U.S. at 678.  It is unclear whether in the specific circumstances presented

in this case, the performance of religious holiday music at the December concerts would violate

the Establishment Clause, and the Court declines to render an opinion as to that issue.

Accordingly, given the uncertainty inherent in all Establishment Clause-related decisions, the

Court concludes that Defendants' stated purpose is not a sham.

       Assuming that the Establishment Clause does not require the restrictions enacted by

Defendants, however, does not automatically render Defendants' stated purpose a "sham."

Evidence suggests that the interpretation of Policy 2270 was spurred by at least one parent's

complaint. (<u>See</u> Decl. of Attorney Robert J. Muise (No. 38), Ex. P-5 at SO0212-13.)

Superintendent Horoschak stated that in his annual performance review where the interpretation

of Policy 2270 was considered, it was noted that "you really can't balance all religious groups in

these representations in these types of performances."  (O'Neill Cert., Ex. B (No. 37-5) at 113:9-

11.)  And, Assistant Superintendent Memoli indicated that the discussion at the October 14, 2004

meeting revolved around doing "what is best for [the students] so that we feel that we're treating

FOR PUBLICATION

everyone on an equal basis," (Defs.' Reply Br., Ex. B (No. 45-4) at 53:7-10), and making sure

that "no child feels uncomfortable in celebrating a holiday that wasn't their own," (id., Ex. B at

59:23-25).  As such even if the Establishment Clause does not necessitate Defendants' actions,

the evidence convinces the Court that Defendants' actions were motivated by their professed

purpose of prevention of an overt endorsement of religion or an improper focus on religious

holidays.

      Despite assertions to the contrary, Plaintiff has presented no evidence to support his claim

that Defendants' stated purpose was a sham.  Moreover, Plaintiff has presented no evidence to

support the notion that the purpose behind Defendants' interpretation of Policy 2270 was to show

disapproval of religion.  In contrast, there is ample evidence to support Defendants' claim that the

purpose of the interpretation of Policy 2270 was to prevent an overt endorsement of religion or an

improper focus on religious holidays.  As a result the Court is satisfied that the interpretation of

Policy 2270 had a secular purpose.[10]

---

[10]  Plaintiff also claims that "based on the totality of the evidence, the only reasonable inference is that the purpose of this policy was to specifically ban the performance of *Christmas* music."  (Pl.'s Supporting Br. at 17; Pl.'s Opp. Br. at 17.)  Plaintiff believes that "[w]ithout question, Christmas was the target of this policy from its inception" because "Ms. Cohen, the close acquaintance of former board member Shelly Slafkes and the parent who lodged the initial complaint that started the policy revision process, was opposed to *Christmas* religious music." (Pl.'s Supporting Br. at 17; Pl.'s Opp. Br. at 17.)  Defendants respond that "Policy 2270 is religiously neutral and bans the performance of *any* religious music which is celebratory of religious holidays," noting that "Hanukkah music, for example, is included within the ban." (Defs.' Opp. Br. at 7-8.)

      According to the Supreme Court, "[i]f someone in the government hides religious motive so well that the ''objective observer, acquainted with the text, legislative history, and implementation of the statute,'' . . . cannot see it, then without something more the government does not make a divisive announcement that in itself amounts to taking religious sides."

FOR PUBLICATION

## B.    "Effect" Prong

"The effect prong asks whether, irrespective of government's actual purpose, the practice

under review in fact conveys a message of endorsement or disapproval."  Lynch, 465 U.S. at 690

(O'Connor, J., concurring).  Accordingly, courts "must determine whether, under the totality of

the circumstances, the challenged practice conveys a message favoring or disfavoring religion."

Am. Civil Liberties Union of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1486

(3d Cir. 1996).  In analyzing a governmental action under the effect prong, the perspective is that

of the "reasonable observer."  Id.  Courts must look to "the 'history and ubiquity' of a practice . . .

because it provides part of the context in which a reasonable observer evaluates whether a

challenged governmental practice conveys a message of endorsement" or disapproval of religion.

County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 630,

109 S. Ct. 3086, 3121 (1989) (O'Connor, J., concurring in part and concurring in judgment).

Plaintiff argues that "[t]he clear effect of the School District's policy is to show

disapproval of religion in violation of the Establishment Clause."  (Pl.'s Supporting Br. at 24.)

Plaintiff notes that "the reasonable observer would know that the School District has adopted and

enforces an official policy that bans only religious music or music associated with a religious

holiday and that it was implemented to ban students and student groups from playing traditional

_____

McCreary, 545 U.S. at 863 (internal citation omitted).  The text of Policy 2270 states that
"[m]usic programs prepared or presented by student groups as an outcome of the curriculum
shall not have a religious orientation or focus on religious holidays."  (O'Neill Cert., Ex. A (No.
37-4) at SO0141.)  The October 29, 2004 memorandum provides that "[w]e will avoid any
selection which is considered to represent any religious holiday, be it Christmas, Hanukkah, etc."
(Id., Ex. I (No. 37-12) at SO0143.)  The broad applicability of the interpretation of Policy 2270
undermines Plaintiff's argument that its purpose is specifically to ban Christmas music.

**FOR PUBLICATION**

Christmas music . . . at various event during the 2004 Christmas holiday season," that "the MLK

Gospel Choir was permitted in the past to perform traditional Christmas religious music at the

Columbia High School Holiday Assembly but has now been banned from performing at this

event," that "the high school brass ensemble has been banned from performing any traditional

Christmas songs and carols . . . at these concerts," and that "it is permissible, from a constitutional

perspective, for a school district to allow religious music, including Christmas music, in its public

schools and at other school-sanctioned events."  (Id. at 36-37; Pl.'s Opp. Br. at 34-35.)  Moreover,

according to Plaintiff, "the public perception and reaction to the policy and its implementation

demonstrate that the challenged policy was '*sufficiently likely to be perceived*' by the community

as a 'disapproval' of religion, irrespective of the School District's alleged purpose for adopting

it."  (Pl.'s Supporting Br. at 20.)

        Defendants assert that "it is clear that the effect of the defendants' current policy is one

that encourages and promotes complete religious neutrality, neither favoring nor demonstrating

hostility toward religion."  (Defs.' Opp. Br. at 14.)  According to Defendants, "[t]he narrow

restrictions placed upon the performances by the MLK Gospel Choir and the high school brass

ensembles are grounded in this policy of complete religious neutrality and are reasonable and

limited in their scope."  (Id.)

        The Court agrees that before the interpretation of Policy 2270 in 2004, certain religious

holiday music was performed at the December concerts, including by the Columbia High School

Brass Ensemble, and the MLK Gospel Choir participated in the concerts.  To be sure, wholesale

changes to the programs of the December concerts alone and without more might send a message

**FOR PUBLICATION**

of disapproval to the reasonable observer.  The Court also acknowledges the complaints by

members of the community, and by the "district music teachers."  Such complaints, if informed

by "the totality of the circumstances," may assist the Court in its consideration of the perspective

of the reasonable observer.[11]  The Court, however, finds that there is ample evidence available to

the objective observer regarding the interpretation of Policy 2270 in the totality of circumstances,

which removes any claim that it conveys a message of disapproval of religion.

       The text of Policy 2270 clearly indicates an effort to include religious material when

appropriate, provided that it is presented objectively and that it fits within the curriculum.  In its

introductory section, Policy 2270 states that "[w]e are cognizant of the role of culture, including

religion, in the development of our society and believe that objectively teaching about religion

and its role in the social and historical development of civilization does not violate the religious

neutrality of the public schools." (O'Neill Cert., Ex. A (No. 37-4) at SO0140.)  With respect to

curricular objectives, Policy 2270 "[p]ermits the inclusion of religious literature, music, drama,

dance and visual arts in the curriculum provided that it achieves specific goals of the written

curriculum in the various fields of study; that it is presented objectively; and that it neither

inhibits nor advances any religious point of view."  (Id.)  In particular, Policy 2270 requires

"[a]ccommodat[ion of] student-initiated expression in response to questions or assignments which

reflect their beliefs or non-beliefs about religious themes" and "permit[s] religious symbols to

teach about historical or cultural context."  (Id.)  When specifically dealing with religious

---

      [11]  These complainants, however, may not serve as proxies for the reasonable observer, as
it is unclear of the extent of their knowledge of the totality of the circumstances.

FOR PUBLICATION

holidays, Policy 2270 directs that "opportunities to learn about cultural and religious traditions should be provided within the framework of the curriculum." (Id., Ex. A at SO0141.) Moreover, Policy 2270 allows for the use of religious music, provided "it achieves specific goals of the music curriculum." (Id.)

There is no doubt that the text of Policy 2270 also places restrictions on religion. Religious symbols are not permitted "to promote or celebrate religious concepts, events or holidays." (Id., Ex. A at SO0140.) "Decorations with religious significance are not permitted." (Id., Ex. A at SO0141.) And, of importance to this matter, "[m]usic programs prepared or presented by student groups as an outcome of the curriculum shall not have a religious orientation or focus on religious holidays." (Id.) These restrictions, are tailored to ensure the objective presentation of religion and to confine religion to the educational curriculum. As a result, the objective observer, armed with knowledge of both Policy 2270's accommodations to religion and restrictions on religion, would not conclude that the text of Policy 2270 sends a message of disapproval of religion.[12]

The implementation of Policy 2270 reinforces this conclusion, particularly regarding the School District's treatment of religious music. Although the interpretation of Policy 2270

---

[12] In fact, it is most likely that the objective observer would conclude that the text of Policy 2270 sends a message of neutrality towards religion. Statements such as "[t]he use and/or display of religious symbols should provide an environment whereby students of all faiths, beliefs or non-beliefs can participate without betraying their own faith or beliefs" and "special effort must be made to ensure the activity is not devotional and that pupils of all faiths and beliefs can join without feeling they are betraying their own faith or beliefs," (O'Neill Cert., Ex. A (No. 37-4) at SO0141), reveal a sensitivity towards ensuring that the School District maintains complete neutrality in matters of religion.

FOR PUBLICATION

restricts the performance of holiday music during the December concerts, music teachers have

indicated that they continue to teach those songs in the classroom, (see Pl.'s Mot. for Summ. J.,

Ex. I (No. 36-14) at 43:5-10; O'Neill Cert., Ex. L (No. 37-15) at 43:5-10), and Director of Fine

Arts Santoro has confirmed the appropriateness of this practice, (O'Neill Cert., Ex. H (No. 37-11)

at 32:8-13; O'Neill Cert., Ex. J (No. 37-13)).[13]  The interpretation of Policy 2270 also has not

affected the performance of songs with religious content such as Concerto VIII Fatto per la notte

de natale, Wade in the Water, Waters of Babylon, Agnus Dei/Cum Sanctis, Laudamus Te,

Jubilate, Ich will dem Hern, and Cum Sancto Spiritu.  (Defs.' Supporting Br. at 9; see O'Neill

Cert., Exs. M (37-16) & N (37-17).)  It simply restricts the performance of holiday music at the

time of the religious holiday that the music honors.  (Pl.'s Mot. for Summ. J., Ex. C (No. 36-6) at

77:6-12.)  Given the continued performance of religious songs and the continued teaching of

holiday music in the classroom, the objective observer would not determine that the

implementation of Policy 2270, with respect to the School District's treatment of religious music,

sends a message of disapproval of religion.

The content of the discussions leading to the interpretation of Policy 2270 further

undermine any arguments that it conveys a message of disapproval of religion.  At Superintendent

Horoschak's annual performance review, the School Board raised concerns that "you really can't

balance all religious groups in these representations in these types of performances."  (O'Neill

---

[13]  The Court recognizes that the implementation of Policy 2270 could indirectly
influence curricular decisions made by the School District's music staff because the programs
performed during the December concerts are typically an outgrowth of the curriculum.  The
Court, however, is unaware of any evidence indicating that the implementation of Policy 2270
has actually had an effect on the curriculum or, if it has, the magnitude of that effect.

FOR PUBLICATION

Cert., Ex. B (No. 37-5) at 113:9-11.)   Assistant Superintendent Memoli stated that discussion at

the October 14, 2004 meeting involved ensuring that the administration is "treating everyone on

an equal basis," (Defs.' Reply Br., Ex. B (No. 45-4) at 53:7-10), and that "no child feels

uncomfortable in celebrating a holiday that wasn't their own," (id., Ex. B at 59:23-25).  The

evidence suggests that had the objective observer attended Superintendent Horoschak's annual

performance review or the October 14, 2004 meeting, he would have likely concluded that the

interpretation of Policy 2270 conveys neutrality towards religion, not disapproval of religion.

The interpretation of Policy 2270 expressly restricts the performance of holiday music,

which changed earlier practices within the School District.  This result, however, does not

automatically convey a message of disapproval of religion because as the Supreme Court

observed in County of Allegheny, "[a] secular state, it must be remembered, is not the same as an

atheistic or antireligious state."  492 U.S. at 610.  By emphasizing the objective presentation of

religion within the confines of the curriculum, continuing to allow the performance of religious

music that does not focus on a particular holiday and to teach all religious music, even holiday

music, inside the classroom, and acting on concerns of maintaining the appearance of neutrality

within the School District, Defendants do not convey a message of disapproval of religion

through the interpretation of Policy 2270.

## C.    "Excessive Entanglement" Prong

"There is no exact science in gauging the entanglement of church and state."  Roemer v.

Bd. of Pub. Works of Md., 426 U.S. 736, 766, 96 S. Ct. 2337, 2354 (1976).  But, "[a]n

entanglement must be ''excessive' before it runs afoul of the Establishment Clause,' and this

FOR PUBLICATION

requires more than mere '[i]nteraction between church and state,' for some level of interaction

has always been 'tolerated.'" Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch.

Dist., 386 F.3d 514, 534 (3d Cir. 2004) (quoting Agostini v. Felton, 521 U.S. 203, 233, 117 S. Ct.

1997, 2015 (1997)).  According to the Supreme Court, "the factors we use to assess whether an

entanglement is 'excessive' are similar to the factors we use to examine 'effect.'" Agostini, 521

U.S. at 232.

 According to Plaintiff, "school officials will be required to screen music to determine

whether it is religious or secular in nature," and "[d]rawing such distinctions between secular and

religious themes will necessarily cause an entanglement with religion."  (Pl.'s Supporting Br. at

37-38; Pl.'s Opp. Br. at 35-36.)  Plaintiff concludes that "rather than making distinctions based on

criteria related to learning and education, the School District is making distinctions based purely

on *religious criteria* . . . thereby creating an impermissible entanglement."  (Pl.'s Opp. Br. at 37.)

 Defendants argue that "[t]he entire objective of the School District's current Policy is to

avoid government entanglement with religion" and to "avoid becoming entangled in disputes and

disagreements over the celebration of religious holidays, by maintaining a policy of complete

religious neutrality when it comes to school sponsored assemblies and activities."  (Defs.'

Supporting Br. at 19-20.)  Defendants maintain that "while enforcement of Policy 2270 has

required some minimal screening of music selections, there is no suggestion in the record that the

District's current policy has resulted in excessive entanglement issues."  (Defs.' Opp. Br. at 17.)

 Policy 2270 states that "[m]usic programs prepared or presented by student groups as an

outcome of the curriculum shall not have a religious orientation or focus on religious holidays."

**FOR PUBLICATION**

(O'Neill Cert., Ex. A (No. 37-4) at SO0141.)  The October 29, 2004 memorandum indicates that

"[a]ll programs will be reviewed and approved" by Director of Fine Arts Santoro and instructs the

School District music staff to "avoid any selection which is considered to represent any religious

holiday."  (Id., Ex. I (No. 37-12) at SO0143.)  Clearly, this screening of musical selections

required by the interpretation of Policy 2270 involves some entanglement with religion.

      If the Court were to conclude that the interpretation of Policy 2270 fostered an excessive

entanglement with religion, however, Defendants would find themselves in a "Catch-22" – an

action taken specifically to avoid an Establishment Clause violation, in and of itself would cause

an Establishment Clause violation.  The Court is disinclined to prompt this predicament,

particularly given that it would create the risk of an Establishment Clause violation every time

that a governmental entity engaged in decisionmaking regarding a religious topic.  The

Establishment Clause "is a blurred, indistinct, and variable barrier depending on all the

circumstances of a particular relationship," Lemon, 403 U.S. at 614, and governmental entities

must feel free to navigate the hazy contours of the Establishment Clause in order to achieve the

mandate of governmental neutrality.

      Plaintiff characterizes the oversight that the interpretation of Policy 2270 requires as

"[d]rawing . . . distinctions between secular and religious themes."  (Pl.'s Supporting Br. at 37-38;

Pl.'s Opp. Br. at 36.)  This type of oversight – this drawing of distinctions between secular and

religious themes – strikes the Court as no different from the screening that school districts engage

in every day to ensure neutrality in matters of religion.  Indeed, a similar drawing of distinctions

between secular and religious themes occurs within this School District with regard to the

FOR PUBLICATION

treatment of holidays in the classroom.  (O'Neill Cert., Ex. A (No. 37-4) at SO0141 ("Religious

holidays are not to be celebrated in the schools, except in the form of the secular nature of that

holiday.").)

What the interpretation of Policy 2270, and Policy 2270 as a whole, seek to achieve is the

objective presentation of religion within the School District; what they seek to avoid is the overt

endorsement of religion within the same.  Although accomplishment of these goals necessitates

some involvement or entanglement with religion, such entanglement is not excessive.  To

conclude otherwise ignores the evidence and would undermine governmental efforts to comply

with the Establishment Clause.

*     *     *

The Court finds that the interpretation of Policy 2270 has a valid secular purpose, does not

convey a message of disapproval of religion, and does not foster an excessive entanglement with

religion.  The Court grants Defendants' motion for summary judgment and denies Plaintiff's

motion for summary judgment with respect to the Establishment Clause claim.

    **2.**       **The First Amendment Claim**

Plaintiff's second claim is that the interpretation of Policy 2270 violates his children's

right to receive information and ideas, right to learn, and right to academic freedom.  The parties'

arguments with respect to the First Amendment claim amount to a disagreement about the proper

precedent upon which the Court should rely.  According to Plaintiff, <u>Board of Education, Island

Trees Union Free School District No. 26 v. Pico</u>, 457 U.S. 853, 102 S. Ct. 2799 (1982), serves as

the starting point for the Court's analysis.  Defendants, however, refer to <u>Hazlewood School</u>

**FOR PUBLICATION**

District v. Kuhlmeier, 484 U.S. 260, 108 S. Ct. 562 (1988), as the authority for the Court's

consideration of the First Amendment claim.

When the Court addressed the First Amendment claim in its September 29, 2005 Opinion,

it determined that Kuhlmeier was the appropriate precedent for this case.  (Op. (No. 13) at 17.)

Although the Third Circuit vacated the September 29, 2005 Order, its decision only specifically

addressed the Court's conclusions with respect to the Establishment Clause claim and did not call

into question the Court's holding regarding the First Amendment Claim.  After reviewing the

evidence presented for these motions for summary judgment, the Court sees no reason to deviate

from its earlier conclusions regarding the First Amendment claim and holds that Kuhlmeier, not

Pico, provides the framework for analysis of the First Amendment claim and that the

interpretation of Policy 2270 does not violate Plaintiff's children's right to receive information

and ideas, right to learn, and right to academic freedom.

### A.    **Pico versus Kuhlmeier**

Pico involves the constitutionality of a school board's decision to remove certain books

from its school districts' libraries.  457 U.S. at 856-58.  Kuhlmeier involves the constitutionality

of a school principal's decision to delete two pages of student-written articles from a school

newspaper.  484 U.S. at 262-64.  When superficially comparing the two cases, Pico deals with the

right to receive ideas, whereas Kuhlmeier deals with the right to express ideas.  Because the First

Amendment claim is based upon Plaintiff's children's right to receive information and ideas, right

to learn, and right to academic freedom, as opposed to his children's right to perform holiday

music, it appears that this case may align more closely with Pico.  Pico, however, expressly limits

FOR PUBLICATION

its holding to its facts, whereas Kuhlmeier's holding reaches beyond the scope of its factual

context.

At the outset of its plurality opinion, the Pico Court emphasizes "the limited nature of the

substantive question presented by the case," 457 U.S. at 861-62, summarizing it in the following

manner: "[D]oes the First Amendment impose any limitations upon the discretion of petitioners to

remove library books," id. at 863?  Pico then proceeds to discuss at great length "the special

characteristics of the school library," id. at 868-69, and to reject arguments given "the unique role

of the school library" and "the regime of voluntary inquiry that there holds sway" at the library,

id. at 869.  The Kuhlmeier Court, on the other hand, broadly describes the issue that it addresses

as "whether the First Amendment requires a school affirmatively to promote particular student

speech."  484 U.S. at 270-71. This issue, according to the Supreme Court, "concerns educators'

authority over school-sponsored publications, theatrical productions, and other expressive

activities that students, parents, and members of the public might reasonably perceive to bear the

imprimatur of the school."  Id. at 271.

The Court concludes that the December concerts are more appropriately characterized as

"expressive activities that students, parents, and members of the public might reasonably perceive

to bear the imprimatur of the school," than compared with the school library.  Accordingly,

regardless of how Plaintiff presents his underlying rights, Kuhlmeier governs the issues raised in

this case.[14]

--------

[14]  Even if the Court were to conclude that Pico was the appropriate precedent for this
matter, however, the Court finds that the case does not support Plaintiff's position.  According to
the plurality opinion, "[o]ur Constitution does not permit the official suppression of ideas," so

FOR PUBLICATION

> B.    **Analysis Under <u>Kuhlmeier</u>**

To analyze the interpretation of Policy 2270 under <u>Kuhlmeier</u>, the Court must first address

the threshold issue of whether the December concerts are public fora.  If the Court concludes that

the December concerts are not public fora, the Court must then determine whether the

interpretation of Policy 2270 is "reasonably related to legitimate pedagogical concerns."

> i.    **Forum Analysis**

According to the <u>Kuhlmeier</u> Court, "school facilities may be deemed to be public forums

only if school authorities have 'by policy or by practice' opened those facilities 'for

indiscriminate use by the general public' . . . or by some segment of the public, such as student

organizations." <u>Id.</u> at 267 (quoting <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S.

37, 47, 103 S. Ct. 948, 956 (1983)).  On the other hand, "[i]f the facilities have instead been

reserved for other intended purposes, 'communicative or otherwise,' then no public forum has

been created, and school officials may impose reasonable restrictions on the speech of students,

teachers, and other members of the school community." <u>Id.</u>

The Court is not aware of any evidence indicating that "by policy or practice" the

December concerts were open for "indiscriminate use by the general public."  It appears that

---

"[i]f petitioners <u>intended</u> by their removal decision to deny respondents access to ideas with
which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision,
then petitioners have exercised their discretion in violation of the Constitution." <u>Pico</u>, 457 U.S.
at 871.  The Court has already concluded that the purpose underlying the interpretation of Policy
2270 was to prevent an overt endorsement of religion or an improper focus on religious holidays,
not to show disapproval of religion.  As such the interpretation of Policy 2270 was not intended
to deny Plaintiff access to ideas with which Defendants disagreed and does not qualify as an
official suppression of ideas.

FOR PUBLICATION

students were not free to come on stage to perform a musical number of their choice, as might be

the case in a school-wide talent show.  The School District's music staff carefully tailors the

programs that the students perform, and Director of Fine Arts Santoro approves the programs

ahead of time, a practice that he followed even before the interpretation of Policy 2270.  The

Court concludes that the December concerts are not public fora.

ii.        <strong>Reasonable Relationship to Legitimate Pedagogical Concerns</strong>

When dealing with "school-sponsored publications, theatrical productions, and other

expressive activities that students, parents, and members of the public might reasonably perceive

to bear the imprimatur of the school," "[e]ducators are entitled to exercise greater control over

this . . . student expression to assure that participants learn whatever lessons the activity is

designed to teach, that readers or listeners are not exposed to material that may be inappropriate

for their level of maturity, and that the views of the individual speaker are not erroneously

attributed to the school."  Id. at 271.  Indeed, "[a] school must . . . retain the authority to refuse . .

. to associate the school with any position other than neutrality on matters of political

controversy."  Id. at 272.

Because "[i]t is only when the decision to censor a school-sponsored publication,

theatrical production, or other vehicle of student expression has no valid educational purpose that

the First Amendment is so 'directly and sharply implicate[d]' . . . as to require judicial

intervention to protect students' constitutional rights," any restrictions "over the style and content

of student speech in school-sponsored expressive activities," must be "reasonably related to

legitimate pedagogical concerns."  Id. at 273.  According to the Third Circuit, "[a] wide variety of

FOR PUBLICATION

policy justifications may pass muster under this test." <u>Brody Through Sugzdinis v. Spang</u>, 957

F.2d 1108, 1122 (3d Cir. 1992). Specifically, "'reasonable' grounds for content based restrictions

include the desire to avoid controversy . . . and an interest in maintaining the appearance of

neutrality . . . provided that these are not simply pretexts for viewpoint discrimination." <u>Id.</u>

(internal citations omitted).

      As discussed under the "purpose" prong of the <u>Lemon</u> test, Defendants have provided

sufficient evidence to convince the Court that the interpretation of Policy 2270 was intended to

prevent an overt endorsement of religion or an improper focus on religious holidays. Just as that

purpose was not a sham, it was also not a pretext for viewpoint discrimination. The Court finds

that the interpretation of Policy 2270 is reasonably related to legitimate pedagogical concerns.

*    *    *

      Applying the standards articulated in <u>Kuhlmeier</u> to this case, the Court concludes that the

December concerts are not public fora and that the interpretation of Policy 2270 is reasonably

related to legitimate pedagogical concerns. The Court grants Defendants' motion for summary

judgment with respect to the First Amendment claim.

<b>CONCLUSION</b>

      For the stated reasons, Plaintiff Michael Stratechuk's motion for summary judgment is

denied; Defendants Board of Education, South Orange Maplewood School District, Brian F.

O'Leary, and Peter P. Horoschak's motion for summary judgment is granted.

August 28, 2008                                <u>s/William H. Walls</u>
                                                United States Senior District Judge

-37-

**FOR PUBLICATION**

**Appearances**

Robert J. Muise, Esq.
Thomas More Law Center
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI  48106

Christopher A. Ferrara, Esq.
American Catholic Lawyers Association, Inc.
420 Route 46 East, Suite 7
P.O. Box 10092
Fairfield, NJ 07004
                         Attorneys for Plaintiff Michael Stratechuk

Michael F. O'Neill, Esq.
Purcell, Ries, Shannon, Mulcahy & O'Neill
One Pluckemin Way
P.O. Box 754
Bedminster, NJ 07921
                         Attorney for Defendants Board of Education, South Orange Maplewood
                         School District, Brian F. O'Leary, and Peter P. Horoschak